# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DAVID EGLAIN, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-CV-84-SAJ |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER[1/]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2/]  Plaintiff asserts that the Commissioner erred because (1) the ALJ's hypothetical question to the vocational expert included a limitation of "no fine vision" yet the jobs listed by the ALJ contain a DOT requirement of "near acuity" on a "frequent" basis; (2) the ALJ's inclusion of limitations with regard to limiting work with small things conflicted with the DOT requirements of fingering and handling on a frequent basis; and (3) the ALJ's hypothetical included a limitation of "illiteracy" although the DOT requirements for the jobs given contained reading of at least 95 to 120 words per minute. For the reasons discussed below, the Court **reverses and remands** the Commissioner's decision for further proceedings consistent with this opinion.

---

[1/]  This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2/]  Administrative Law Judge Gene M. Kelly (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated December 9, 2004. [R. at 13 - 20].  Plaintiff appealed the decision by the ALJ to the Appeals Council.  The Appeals Council declined Plaintiff's request for review on February 4, 2005.  [R. at 5].

## I. FACTUAL AND PROCEDURAL HISTORY

In his request for a hearing before the ALJ, Plaintiff noted that he was unable to work.  Plaintiff indicated that he had only a fifth grade education and that he could not read or write.  [R. at 41].  Plaintiff noted that he had screws and a stimulator in his back from back surgery.  [R. at 80].  Plaintiff represented that he had difficulty doing anything due to his pain.  [R. at 80].

In a written questionnaire, Plaintiff described his average day.  Plaintiff noted that he woke at 7:00 or 8:00 a.m., and sometimes made breakfast, watched television, listened to the radio.  At about 11:00 a.m., Plaintiff lays down.  Plaintiff plays guitar sometimes, and lays down after that.  Plaintiff eats dinner about 7:30 p.m. and watches television.  Plaintiff goes to bed at 11:30 p.m. or midnight.  [R. at 86].  Plaintiff believes that he is able to sleep only about five hours each night because Plaintiff's pain interrupts his sleep.  [R. at 86].

Plaintiff lives alone.  According to Plaintiff, a friend helps him with his housework and laundry.  [R. at 88].  Plaintiff shops for groceries every week for approximately ten minutes.  [R. at 88].

Plaintiff also noted that he is unable to read well.  Plaintiff indicates that he was in special education thru the ninth grade.  [R. at 89].  Plaintiff plays his guitar and plays solitaire.  If Plaintiff has company, he plays dominoes.  [R. at 89].

On his pain questionnaire, that was completed April 2, 2003, Plaintiff noted that he generally watches television and listens to music and he uses the microwave to make his lunch and dinner.  [R. at 92].  Plaintiff indicated that he experiences lower back pain about six to seven times a day, including sharp burning pain and muscle spasms.  [R. at 92].

Plaintiff listed Elavil and Bextra as prescriptions he took on an "as needed" basis.  [R. at 93].

Plaintiff completed a medications list on November 16, 2004.  Plaintiff listed Ibuprofen for pain; Nyquil for assistance sleeping, and Icy Hot patches for his back.  [R. at 97].

Records from Mayes County Medical Center dated October 9, 2002, indicate Plaintiff complained of headaches.  Plaintiff was noted as stating he had periodically had headaches since his back surgery.  [R. at 106].

On March 7, 2002, Plaintiff described a painful, burning sensation in his lower back after an accident at work.  [R. at 127].  X-rays dated March 7, 2002 indicated minimal degenerative spine changes, with no interval changes since Plaintiff's prior exam in 1999.  [R. at 131].  Notes dated March 14, 2002 indicate Plaintiff injured his lower back at work while lifting large tubs.  [R. at 122].  Plaintiff complained of back pain on March 18, 2002.  [R. at 117, 120].  Plaintiff was treated in the Emergency Room on March 25, 2002, complaining of back pain.  [R. at 113].

Plaintiff was evaluated on May 28, 2002.  [R. at 147].  Plaintiff reported fairly severe back pain radiating to his hips and legs.  [R. at 147].  The doctor noted that Plaintiff was evidently not improving with conservative treatment.  On April 30, 2002, Plaintiff's doctor noted that the MRI scans indicated significant problems above L4-5 and L5-S1.  [R. at 149].

An MRI dated April 18, 2002, indicated central herniation at L4-5.  At the L5-S1 level there was disc desiccation with a broad-based central protrusion , and mild desiccation of the L3-4 disc.  [R. at 150].

Plaintiff was admitted for surgery on June 10, 2002, and discharged on June 13, 2002.  [R. at 154].  Plaintiff was ambulating and doing well.  [R. at 154].

On September 12, 2002, Plaintiff was three months postop and was described as doing very well.  [R. at 141].  X-rays showed excellent alignment and a solid fusion.  The doctor recommended that Plaintiff walk two miles each day.  [R. at 141].

On November 12, 2002, Plaintiff was seen for an office evaluation.  [R. at 137].  The evaluator noted that Plaintiff had been doing his exercises on his own, but that Plaintiff did not, at the time of the evaluation feel well.  Plaintiff was working, and had progressed from four to six hours to eight hours per day, and Plaintiff was planning on working ten hours four days a week the following week.  [R. at 137].  Plaintiff's evaluation was unremarkable.  X-rays showed the alignment well maintained and the fusion solid.  Plaintiff's doctor recommended Plaintiff remain on the 20 pound lifting restriction through the week and for two additional weeks before progressing to a permanent restriction of 50 pounds.  Plaintiff was to be given a full release from his doctor's care effective December 2, 2002, with a permanent lifting restriction of 50 pounds.  [R. at 137].

Don L. Hawkins, M.D., wrote a letter dated May 15, 2003, on behalf of Plaintiff.  [R. at 135-36].  He noted that Plaintiff had been treated for an injury to his back which occurred March 7, 2002, while Plaintiff was lifting heavy items.  Plaintiff had no prior history of back injury.  The doctor noted that Plaintiff had ongoing degeneration in his back and a degree of stenosis, and two herniations in the disks at L4-5 and L5-S1.  Plaintiff was treated, and ultimately had surgery.  Based on the "Guides to Evaluation of Permanent Impairment," Plaintiff's back showed flexion 23 degrees (4 percent impairment); extension 6 degrees (6 percent impairment); lateral lumbar flexion right 22 degrees (1 percent impairment); lumbar

left lateral flexion 17 degrees (2 percent impairment).  Plaintiff's total impairment was noted as 13 percent to the whole man.  The impairment for Plaintiff's surgically treated disk was noted at 8 percent with an additional 1 percent "for the second level," equating to a permanent partial impairment of 21 percent.  The doctor noted that much of Plaintiff's degeneration pre-existed Plaintiff's March 7, 2002 injury.  [R. at 135].  Plaintiff had reached maximum medical improvement and had been dismissed from the doctor's care with a permanent 50 pound lifting restriction.  [R. at 136].

Plaintiff was examined by Ravinder R. Kurella, M.D. on August 9, 2003.  Plaintiff complained of lower back pain, being unable to read or write, and having "shakes" all over his body."  [R. at 177].  Plaintiff reported that approximately three years ago, while at work, something fell on Plaintiff's back and he developed back pain.  Plaintiff had an MRI which showed herniation at L4-L5 and L5-S1.  Plaintiff had a diskectomy and fusion of his lumbar spine, titanium screws and a bone stimulator.  Plaintiff was given a 50 pound weight limitation, and Plaintiff complained of constant back pain.  Plaintiff stated his pain was ten on a level of one to ten.  [R. at 177].  Plaintiff noted he drank two bottles of whiskey each day and that his surgery only helped minimally.  Plaintiff reported smoking four to five packs of cigarettes each day.  [R. at 177].  Plaintiff's vision without his lenses was 20/30 (right), 20/25 (left), and 20/25 (both).  [R. at 178].  Plaintiff had a range of motion of his back as 15 degrees extension with pain (normal 25), flexion 60 degrees with pain (normal 90), lateral flexion on  left was 20 degrees with pain (normal 25) and on the right was 20 degrees with pain (normal 25).  [R. at 179, 181].  Plaintiff's range of motion of the cervical spine was normal.  [R. at 179].  The doctor noted that Plaintiff could effectively oppose the thumb and fingertips; could manipulate small objects; and would have no difficulty in grasping tools

such as a hammer.  [R. at 179].  Plaintiff had full range of motion of the hip joint, knee joint, ankle joint, and shoulder joint.  [R. at 180].  Plaintiff's gait was slow and waddling.  [R. at 180].

A Residual Physical Functional Capacity Assessment was completed by Paul Woodcock on September 12, 2003.  [R. at 191].  He noted that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about six hours in an eight hour day, and sit for about six hours in an eight hour day.  [R. at 185].

A Physical Residual Functional Capacity Assessment form was completed by Thurma Fiegel, M.D., on November 3, 2003.  [R. at 193].  Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours in an eight hour day, and sit for about six hours in an eight hour day.  [R. at 194].

On June 29, 2004, Plaintiff was taken to the Emergency Room after he slipped and fell in water.  [R. at 203].  Plaintiff was given Lortab for pain.  [R. at 202].  A CT of Plaintiff's brain was normal.  [R. at 207].  X-rays of Plaintiff's cervical spine revealed normal alignment.  Plaintiff's lumbar spine showed metal fixation with vertebral heights maintained.  [R. at 208].

Plaintiff testified at a hearing before the ALJ on November 16, 2004.  [R. at 232].  Plaintiff was 41 years old at the time of the hearing before the ALJ.  Plaintiff was born May 24, 1963.  [R. at 239].  Plaintiff is 5'5" or 5'6" tall and weighs approximately 175 pounds.  [R. at 239].

Plaintiff testified that he has difficulty reading, writing, and using numbers.  [R. at 240-41].  Plaintiff stated that he had no education beyond his ninth grade education.  [R. at 241].

-- 6 --

Plaintiff previously worked as a grinder for a company for approximately one and one-half years.  [R. at 241].  Plaintiff also worked for a shoe factory.  [R. at 242].  Plaintiff stated that he was not required to write or read any reports.  [R. at 242].

Plaintiff stated that he believed he was unable to work because he could not read or write.  [R. at 243].  Plaintiff also testified that he has screws in his back and is unable to balance well.  [R. at 244].  Plaintiff noted that he was supposed to wear glasses, but that he did not have glasses.  [R. at 244].  With glasses, Plaintiff noted that his vision was 20/20.  [R. at 245].  Plaintiff also stated that he was generally in pain, all of the time, in his lower back and in his legs.  [R. at 244].

Plaintiff testified that he drinks heavily so that he can alleviate his back pain and sleep.  [R. at 246].  Plaintiff noted that he also uses pain patches and sometimes takes Nyquil to assist him in sleeping.  [R. at 246].  Plaintiff usually drinks two bottles (pints) of whiskey each evening.  Plaintiff noted that his doctors have told him to slow down, but that Plaintiff doesn't listen to them because he cannot afford pain medication.  [R. at 249].

According to Plaintiff, he has never recovered from his back surgery.  [R. at 246].  Plaintiff does not recall being released by his doctor.  [R. at 246].  Plaintiff stated he was unable to bend to pick things up, and required assistance.  [R. at 247].

Plaintiff noted that his fingers were sometimes numb, and that although he could pick up a dime he would not be able to feel the dimes with his fingertips if he was blindfolded.  [R. at 247].

Plaintiff believes he can sit for about thirty minutes before he needs to stand.  [R. at 253].  Plaintiff believes he could stand for about thirty minutes.  [R. at 253].  Plaintiff can walk about one block but then has to return to his house.  Plaintiff knows he cannot lift 50

pounds, and is certain he cannot lift 20 pounds either.  Plaintiff believes he can pick up a five pound bag of sugar but cannot lift a ten pound bag.  [R. at 254].  Plaintiff can lift a gallon of milk.  [R. at 254].  Plaintiff spends about six hours a day in his recliner.  [R. at 256].  Plaintiff believes he could alternate sitting and standing for about two hours but that after that time he would need to sit in his recliner.  [R. at 257].

Plaintiff stated that he cannot read or write at all.  Plaintiff state he was recently taught to sign his name.  [R. at 259].

According to Plaintiff, the Lortabs helped with his pain more than the alcohol, but the Lortabs were too expensive, so he started drinking to ease the pain.  [R. at 260].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social security claims.  *See* 20 C.F.R. § 404.1520.  Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . .

42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3/]

---

[3/]  Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572).  Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 1521.  If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, claimant's

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*.  *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner.  *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational.  *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of

---

impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled.  If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work.  A claimant is not disabled if the claimant can perform his past work.  If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy.  If a claimant has the RFC to perform an alternate work activity, disability benefits are denied.  *See* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

[4/]   Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance. *Perales*, 402 U.S. at 401. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

### III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff could lift or carry 20 pounds, stand or walk six hours in an eight hour day for thirty minutes at a time, and sit for six hours in an eight hour day for thirty minutes at a time.  [R. at 18].  The ALJ additionally found that Plaintiff was slightly limited with respect to fingering, feeling and grasping and could perform no work requiring fine vision.  The ALJ found that Plaintiff was unable to perform his past relevant work, and based upon the testimony of a vocational expert concluded Plaintiff was not disabled at Step Five of the sequential evaluation.

### IV.  REVIEW

Plaintiff suggests that the Tenth Circuit Court of Appeals requires that, in a case in which a claimant is restricted to less than the full range of sedentary work, a heightened examination is applied.  Plaintiff relies on *Saiz v. Barnhart*, 392 F.3d 397 (10th Cir. 2004). In *Saiz*, the claimant was restricted to a sedentary RFC which the Court recognized as representing a significantly restricted range of work.  The Commissioner's regulations therefore exclude the application of the Grids as the support for a finding of disabled if a claimant can perform anything less than the full range of sedentary work.  In *Saiz*, the

claimant had a reaching restriction which the Court noted was required in almost all jobs and therefore eroded the base of jobs which supports the Grids.  The Court therefore reversed noting that the Court had, on numerous occasions reversed due to a lack of a match between the RFC and the Grids.  Plaintiff extrapolates from this to a conclusion that "the Circuit in *Saiz, supra*, was saying that in those cases where a claimant is restricted to less than the full range of sedentary work, a heightened examination (and consequent review) is applied as to alternative jobs at Step 5, because ordinarily such persons are considered disabled."  Plaintiff's Brief [Docket No. 15-1, at 9].  This Court does not interpret *Saiz* in this manner and nothing in Plaintiff's brief or the jurisprudence relied upon by Plaintiff persuades the Court that a "heightened examination" and consequently a heightened standard of review applies to Step Five decisions.

Plaintiff's primary assertion of error is that, in several respects, the ALJ's finding as to Plaintiff's RFC conflicted with the two jobs listed by the vocational expert that Plaintiff can perform.  Plaintiff asserts that the conflict between the testimony of the vocational expert and the DOT were not adequately resolved in the record and require the reversal of this action.

The vocational expert, in answer to the ALJ's hypothetical, testified that Plaintiff could perform the jobs of sorter and bonder.

Plaintiff references only one DOT listing for "bonder" (726.685-066 bonder, semiconductor)  and one DOT listing for "sorter" (521.687-086 nut sorter), asserting that only those two listings have an SVP of 2.  However, shell-mold-bonding machine operator (listed as a "bonder," 518.685-026) has an SVP of 2.  In addition, several other "sorters" list an SVP of 2.  The DOT lists 19 positions as "sorter."  A "sorter, agricultural produce

(529.687-186) lists an SVP of 2; a "sorter (brick & tile)" lists an SVP of 2; a "cannery worker" (529.686-014) lists an SVP of 2; a "sorter (boot & shoe)" lists an SVP of 2.[5/] Defendant does not challenge Plaintiff's position that the sorter and bonder positions are limited.

Plaintiff initially notes that the sorter job requires a reading rate of at least 95 to 120 words per minute and the bonder job requires a reading rate of 190 - 215 words per minute. Plaintiff notes that Plaintiff is illiterate and unable to read at the rates required by the jobs listed by the vocational expert.   Although Plaintiff focuses upon only two of the classifications for jobs in the DOT, each of the classifications reviewed by the Court contained, at a minimum, a "LD," or "Language Development" listing of "1."  The Language Development of "1" provides for a recognition of 2,500 two or three syllable words and reading at a rate of 95 - 120 words per minute.  Plaintiff asserts that he is illiterate.  The ALJ found, and provided in the hypothetical that Plaintiff was illiterate.  However, the DOT classifications for the jobs of sorter or bonder suggest a minimum reading rate.  The only discussion of illiteracy by the vocational expert is when the vocational expert is asked whether the sorter position required the ability to read.  The vocational expert answers, "I – no.  You're talking about agricultural products and, and that.  So you're looking at items." Assuming the explanation by the vocational expert is sufficient to resolve the conflict between the DOT and the testimony of the vocational expert, this would provide approximately 500 jobs within Oklahoma that Plaintiff is capable of performing.  [R. at 266].

---

[5/]   This is only a partial list of those positions listed in the DOT as "sorter" with an SVP of 2.

The vocational expert is not questioned about Plaintiff's illiteracy with respect to the remaining job listed.

Plaintiff additionally asserts that the sorter and bonder jobs, as listed in the DOT require frequent fingering and handling, and near acuity on a frequent basis.  Plaintiff maintains that these requirements conflict with the ALJ's finding that Plaintiff could not work with "tiny things," and the inclusion by the ALJ in Plaintiff's RFC that Plaintiff was slightly limited with respect to fingering.

Defendant asserts that Plaintiff's testimony indicates that Plaintiff had blurry vision without glasses, but that corrected his vision was 20/20.  Defendant also maintains that the record reflects that some examining doctors concluded that Plaintiff could effectively manipulate objects. Defendant is correct with regard to Plaintiff's testimony and the record. However, the ALJ found that Plaintiff was "slightly limited with respect to fingering, feeling and grasping and can perform no work requiring fine vision." [R. at 18].  In his hypothetical question, the ALJ noted a "slight limitation in finger, feel, and grip.  I'm not saying that he can't use his hands and fingers to work with, but there'd be a little diminution from full.  And I, I intend to eliminate – that he can work with big things, but he may not be able to work so well with small tiny things like pen and clip fastening and working with tiny nuts and bolts.  No fine vision.  And I'm not saying he can't use his eyes to work.  But there'd be some blurriness he's indicated, especially without his glasses.  So I think I'm going to limit it sort of like I did with the finger.  Is he can work with big things but he shouldn't be doing small tedious work with pen and clip fastening or working with small nuts and bolts."  [R. at 266-67].  Defendant does not address whether or not the vocational expert adequately addressed what appears to be a conflict between the ALJ's finding that Plaintiff has slightly

limited vision, slightly limited ability to finger and grasp, and the DOT listings referenced by Plaintiff which require "near acuity" on a "frequent basis."

Based on the record, a conflict appears to exist between the testimony of the vocational expert and the DOT.  The record does not adequately address or resolve this conflict.  On remand, the ALJ should explore with the vocational expert whether Plaintiff's alleged illiteracy, visual and manipulative restrictions would in any way interfere with Plaintiff's ability to perform the jobs listed by the vocational expert, and should specifically address whether or not these conclusions conflict with the DOT.

Dated this 27th day of February 2006.

Sam A. Joyner
United States Magistrate Judge